**E-filed 04/10/08**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TRENT WEST,<br><br>           Plaintiff,<br><br>   v.<br><br>JEWELRY INNOVATIONS, INC., TOSYALI INTERNATIONAL, INC. (dba BENCHMARK), DIAMOND NORTHSTAR, INC. (dba TUNGSTEN MAGNUM) and A JAMAIS DESIGNS, INC. (dba INFINITY RINGS), and CROWN RINGS, INC.<br><br>           Defendant. | Case Number C-07-1812 JF (HRL)<br><br>ORDER[1] CONSTRUING CLAIMS OF UNITED STATES PATENT NOS. 6,928,734; 6,990,736, 7,032,314; AND 7,076,972<br><br>[re: docket nos. 125, 145] |

On April 3, 2008, the Court held a hearing for the purpose of construing disputed terms in the claims of United States Patent Nos. 6,928,734 ("the '734 patent"), 6,990,736 ("the '736 patent"), 7,032,314 ("the '314 patent") and 7,076,971 ("the '972 patent"). After consideration of the arguments and evidence presented by the parties and the relevant portions of the record, the Court construes the disputed terms as set forth below.

---

[1] This disposition is not designated for publication and may not be cited.

## I. BACKGROUND

This case involves jewelry rings made of tungsten carbide and a method for making such rings. Plaintiff Trent West ("West") alleges that jewelry rings sold by Defendants Jewelry Innovations, Inc., Tosyali International, Ltd dba Benchmark, Northstar Diamond, Inc., and Crown Rings, Inc.[2] (collectively "Benchmark") infringe four West patents including the '734, '736, '314, and the '972 patents. (collectively referred to as "the patents").

The '736, '314, and '972 patents are continuations-in-part of Application No. 149,796, filed on September 8, 1998, now U.S. Patent No. 6,062,045. The '734 patent issued from Application No. 426,054 that was filed on April 28, 2003. The specifications of the patents are similar although each contain some additional material. The invention generally relates to a method for making jewelry out of tungsten carbide. The patents describe a method of "creating commercially viable tungsten carbide jewelry." Plaintiff's Opening Claim Construction Brief at 3:7. The '734 patent is directed to jewelry rings. The '314, '736, and '972 are directed to methods of making jewelry rings and finger rings.

## II. LEGAL STANDARD

Claim construction is a question of law to be decided by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). The patentee's use of a claim term in the specification is highly relevant to understanding the proper context in which the term is used. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). The specification is the "single best guide to the meaning of a disputed term." *Id., citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

---

[2] At meetings between the parties regarding claim construction, Crown Rings, Inc. ("Crown") submitted its own proposed construction to the disputed terms. However, subsequent to the meeting, Crown did not file a brief supporting its proposed construction but rather submitted a notice of joinder adopting Benchmark's proposed claim construction.

## III. DISCUSSION

1. "Powdered materials", "Powders"

These terms appear in the '734, '736, and '314 patents. "Powdered materials" is recited in the '734 patent at independent claim 16 (emphasis added):

> 1. A method of providing a tungsten-carbide based annular jewelry article having a desired surface profile and including an annular band which comprises: providing a mixture of two or more **powdered materials** which consist essentially of at least 50 weight percent tungsten carbide . . .

The term "powders" is recited in the '736 patent at dependent claim 10 (emphasis added):

> 10. The method of claim 1[3], wherein the hard material is formed by sintering **powders** that consist essentially of tungsten carbide and a metal binder material.

The term "powders" also is recited in the '315 patent at dependent claim 19:

> 19. The method of claim 1[4], wherein the hard material is formed by sintering **powders** that consist essentially of at least tungsten carbide and a metal binder material.

The parties propose the following construction:

| Term | West's proposed construction | Benchmark's proposed construction |
| --- | --- | --- |
| "Powdered materials" | Substance composed of fine particles. | Any solid substance reduced to a state of fine, loose, dry particles by crushing, grinding, disintegration, etc. |
| "Powders" | | |

West asserts that the '734, '736, and '314 patent specifications use the term but that the term is never defined in either the specification or the prosecution history. West argues that because the intrinsic evidence does not define the term, the Court should look to dictionary definitions for guidance. West's proposed construction adopts Webster's Third New International Dictionary ("Webster's") definition of the word "powder".

---

[3] 1. A method of making a jewelry article which comprises: providing an annular substrate formed of a hard material predominantly comprising tungsten carbide . . .

[4] 1. A method of making a jewelry ring which comprises: providing an annular finger ring made of a hard material consisting essentially of tungsten carbide, . . .

Benchmark agrees that the term is not defined in the specification or the prosecution history. Benchmark argues that powder should be defined according to its ordinary and customary meaning and that the terms "dry" and "loose" are part of the ordinary and customary meaning of "powder." For support, Benchmark points to the same dictionary definition cited by West. In the definition, Webster's includes several examples that illustrate its definition. One is "*dry* pulverized earth or disintegrated matter." Another is "powder snow: fine *dry* light snow . . . ." Benchmark offers no explanation for the term "loose" other than to say it is part of the ordinary and customary meaning of powder.

Unless the intrinsic evidence compels a contrary conclusion, the claim language carries the meaning accorded those words in the usage of skilled artisans at the time of invention. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1338 (Fed. Cir. 2005) *citing* <u>*Virtronics Corp. v. Conceptronic, Inc*</u>., 90 F.3d 1576, 1582 (Fed. cir. 1996). The claim should be construed in line with the "technological and temporal" context of the claimed invention. *SmithKline*, 403 F.3d at 1338. Here, the invention uses the term "powders" as it relates to the field of powder metallurgy. For example, the specification of the '734 patent states:

> I have recently discovered that through the use of powder metallurgy and sintering processes, such materials can be manufactured and used to provide faceted designs that were not heretofore practiced. Furthermore, such materials can be used to enhance and protect precious metals and gemstones in this jewelry setting.

'734 patent, col.1 lns.42-47. Embodiments of the inventions relate to "powdered materials" with said materials being defined as metals. *See* '734 patent, col.6 ln.54-col.7 ln.26. Accordingly, in the context of the invention here, powder is used as it relates to the field of powder metallurgy and metals in powder form.

West does not offer any evidence that its general 1976 Webster's dictionary definition of the term powder is what a person of ordinary skill in the art would understand the term to mean in the context of the invention in the instant case. Benchmark argues that West's general definition is too broad because other compositions, such as slurries, also can be composed of fine particles.

The parties have provided the Court with little guidance as to how the term should be

construed. For additional guidance, the Court looked at how the term is defined in other dictionaries. Webster's New Collegiate Dictionary 922 (9th Ed. 1990) defines the term "powder" as "matter in a finely divided state: particulate matter." It includes as an example of a powder "fine, dry snow." The McGraw-Hill Dictionary of Scientific and Technical Terms 1653 (6th Ed. 2003) defines powder as "[a] loose grouping or aggregation of solid particles, usually smaller that 1000 micrometers." It included the term "loose" in the definition. The ASTM Dictionary of Engineering Science & Technology 465 (10th Ed. 2005) defines a powder as "particles that are usually less than 1000 [micrometers]" or "particles of a solid characterized by small size, nominally within the range of from 0.1 to 1000 [micrometers]."

These definitions support West's proposed construction in that a powder is defined by small particle size. However, as discussed above, the specific definition proposed by West arguably could apply to particles in another state. There also appears to be support for Benchmark's inclusion of the terms "dry" and "loose". However, Benchmark has not provided guidance to the Court as to how dry or loose the powder must be. Accordingly, the Court adopts a modified definition of powder: "matter in a finely divided state: particulate matter." This construction does not cover slurries because slurries would not be in a finely divided state, nor does it include the vague terms "dry" and "loose".

2.   <u>"Consist(s) Essentially Of" or "Consisting Essentially Of"</u>

The phrases "consist(s) essentially of" or "consisting essentially of" are used in several of the asserted claims. A representative claim of the '734 patent is set forth below with the disputed term highlighted in bold.

> 16. A method of providing a tungsten-carbide based annular jewelry article having a desired surface profile and including an annular band which comprises: providing a mixture of two or more powdered materials which **consist essentially of** at least 50 weight percent tungsten carbide . . .

The parties propose the following construction:

| Term | West's proposed construction | Benchmark's proposed construction |
|---|---|---|
| "Consist(s) Essentially Of" | Includes the named material(s) and other materials that do not affect the basic and novel characteristics of the invention | Excludes components or ingredients that materially affect the basic and novel characteristics of the claimed composition |
| "Consisting Essentially Of" | | |

Benchmark concedes in its opposition papers that the term "composition" in its proposed definition should be changed to "invention." The parties dispute whether the transitional phrase "consisting essentially of" should be inclusive or exclusive. Benchmark argues that the phrase should be construed as it proposes because West used the term in an exclusionary way during the prosecution of the '734 patent:

> Also, claim 46 recites that the hard material is formed by sintering powders that "consist essentially of" tungsten carbide and a metal binder material. This language excludes amounts of materials like nitrides that have an undesirable effect on the claimed invention. this claim transition term is open to cover additional components but *excludes* components that "'materially affect the basic and novel characteristics' of the claimed composition." *Atlas Powder Co. v. E. I. Du Pont de Nemours*, 750 F.2d 1569, 1574 (Fed. Cir.1984) (quoting *In re Herz*, 537 F.2d 549, 551 (C.C.P.A. 1976)) (emphasis added).

The phrase "consisting essentially of" "limits the scope of a claim to the specified materials or steps 'and those that do not materially affect the basic and novel characteristics of the claimed invention.'" *Manual of Patent Examining Procedure (MPEP)* §2111.03 (8th ed. 2001) (Rev. 6, August 2006) (*quoting In re Herz*, 537 F.2d 549, 551-52 (CCPA 1976)). In this case, West argued to the patent office that its use of this phrase excluded components that materially affected the invention. Accordingly, the Court adopts Benchmark's proposed definition, with the exception that it includes the term "invention" instead of "composition".

3. "Blank"

The term "blank" is used in the asserted claims of the '734 patent. A representative claim of the '734 patent is set forth below with the disputed term highlighted in bold.

> 16. A method of providing a tungsten-carbide based annular jewelry article having a desired surface profile and including an annular band which comprises:

    providing a mixture of two or more powdered materials . . . compressing the powdered material mixture at a pressure sufficient to form an annular **blank**; and sintering the annular **blank** at a temperature sufficient to form the tungsten-carbide based annular jewelry article.

The parties propose the following construction:

| Term | West's proposed construction | Benchmark's proposed construction |
| --- | --- | --- |
| "blank" | shaped and formed material which may be handled in solid form in preparation for further processing | A pre-sintered pressure molded ring shape formed by the compression of two or more powdered materials that consist essentially of at least 50 weight percent tungsten carbide. |

    West assets that its construction is correct because it "is drawn from the language of the '734 [patent] specification and incorporates a succinct dictionary definition to further inform its meaning to one of ordinary skill in the art." Plaintiff's Opening Claim Construction Brief at 11:11-13. West points to the following language in the '734 patent specification for support: "a quantity of powdered . . . material that can be compressed and formed into an oversized 'green' ring bank . . ." '734 patent, col.6 lns.43-48. The powders are "compacted to form a solid of the desired shape . . . that allows the part to be handled." '734 patent, col.1 lns.56-63. From this language, West argues that its construction of "a shaped and formed material which may be handled in solid form" is taken directly from the specification. Additionally, West contends that the '734 patent specification further describes the sintering process that follows the formation of the blank, s*ee* '734 patent, col. 2, ln.30- col. 3 ln.30, and provides that the blank is formed so that it may be handled for further processing. Finally, West argues that Webster's defines a "blank" as "something in an unfinished or incomplete state that is designed for further working or manipulation." West uses this definition to provide support for the inclusion of the language "in preparation for further processing" in its proposed construction.

    Benchmark admits in its opposition brief that its proposed construction adds "irrelevant and/or redundant terms, and should be disregarded." Benchmark Opposition at 6:25-25.

However, Benchmark argues that West's proposed construction is too convoluted to be workable and should not be adopted either. Rather, Benchmark suggests that the term "blank" is known in the industry to be "a piece of material prepared to be made into something (as a key) for further operation."

At the hearing, the parties stated that they had reached an agreement that the term "blank" and that the term should be construed as proposed by West. Accordingly, the Court will adopt West's definition of this term.

4.  "Grinding"

The term "grinding" is used in the claims of the '314 patent. Independent claim 1 is representative, with the disputed term highlighted in bold.

> 1. A method of making a jewelry ring which comprises: providing an annular finger ring made of a hard material consisting essentially of tungsten carbide, with the annular finger ring having at least one external facet and defining an aperture configured and dimensioned to receive a person's finger; and **grinding** the at least one external facet to a predetermined shape to provide a pleasing appearance to the jewelry ring . . .

The parties propose the following construction:

| Term | West's Proposed Construction | Benchmark's Proposed Construction |
|---|---|---|
| "Grinding" | shaping, forming, finishing or polishing by friction | shaping by friction |

West argues that Benchmark's construction is improperly narrow. Benchmark contends that West's proposed construction is inconsistent with the manner in which the term is used in the patent and the specification. In particular, Benchmark argues that West's proposed construction impermissibly includes "polishing" and finishing" in its definition of "grinding". Benchmark points to dependent claim 3 of the '314 patent, which depends from independent claim 1, includes the step of "highly polishing the at least one external facet . ." Further, claims 5, 6, and 8 of the '314 patent also all depend from claim 1 and add the additional polishing step. Specifically, claims 5 and 6, which depend from claim 4, which depends from claim 1, all add a polishing step of polishing the facets "to a mirror finish." Claim 8 also includes a polishing step.

Benchmark argues that because the claims refer to polishing separately from grinding, the term "polishing" cannot be synonymous with "grinding."

Benchmark also points to the specification of the '314 patent to the effect that: "The invention involves the provision of jewelry items made from super hard metals such as tungsten and cemented carbide and high tech ceramics of various colors processed into a predetermined shape then sintered in a furnace and ground and polished into finished form." '314 patent, col.8 lns.19-23. The specification also reads: "Once cooled, the hardened ring stock or other blank configuration can be ground and polished to provide the hard metal or ceramic ring component." '314 patent, col.6 lns.14-15. Finally, Benchmark points out that the term "finish" also is used separately in the specification: "Following the sintering operation, the ring stock can be ground and finish polished . . ." '314 patent col.4 lns.49-50.

Benchmark provides ample support in the intrinsic record to demonstrate that the terms "finishing" and "polishing" should not be part of the definition of "grinding" as used in the context of the patents at issue here. Benchmark states that it does not object to the term "forming" being included in the definition. According, the Court construes the term "grinding" as "shaping or forming by friction."

5.   "Virtually Indestructible During Normal Use"

The phrase "virtually indestructible during use" or "virtually indestructible during normal use" is used in the '314 patent and the '972 patent. Independent claim 1 of the '314 patent is representative with the disputed term highlighted in bold:

> 1. A method of making a jewelry ring which comprises: providing an annular finger ring made of a hard material consisting essentially of tungsten carbide . . . with the hard material being long wearing and **virtually indestructible during use** of the jewelry ring.

The parties propose the following construction:

| Term | West's Proposed Construction | Benchmark's Proposed Construction |
|---|---|---|
| "virtually indestructible during normal use" | practically incapable of having its aesthetic appearance destroyed during employment and enjoyment in a normal daily jewelry wearing environment | "Virtually indestructible": rarely, if ever, breaks, fractures, nicks, dents, or deforms |
| | | "normal use" and "use": Any use of a ring during wearing the ring, or any activity related to the wearing of the ring |

    a.    "Virtually Indestructible"

West argues that this term is directed to the aesthetic appearance of the claimed rings. West asserts that the specification of the '314 and '972 patents support its proposed construction. West points to a portion of the specification that describes a design made on a tungsten ring that was "not possible using prior art rings making techniques and technologies, because if such configuration had been made, the peaks 122 would have quickly been eroded, destroying the aesthetic appearance of the ring." '314 patent, col.7 lns.57-65; '972 patent, col.7 lns.54-61. Additionally, the patent specifications state that "[t]hese facets are unique to hard metal configurations in that precious metal is too soft and facet edges formed in such soft metals would wear off readily with normal everyday use." '314 patent, col.8 ln.64-col.9 ln.3; '972 patent col.8 lns.58-64.

    Benchmark disputes West's proposed construction of the term "indestructible." Benchmark argues that "indestructible" must cover more than the aesthetic properties of the ring. It contends that the term cannot refer to the claimed invention not readily wearing down because this quality is embodied in the term "long wearing" that is used separately in the claim from "indestructible". However, Benchmark does not point to any evidence in the specification showing that the term is directed to the ring itself rather than the aesthetic properties of the ring.

    The claim asserts that the "hard material" is "long wearing" and "virtually indestructible." The hard material is defined in the claim as "an annular finger ring made of a hard material

consisting essentially of tungsten carbide." The claim goes on to state that this annular ring has at least one external facet. Similarly, claim 1 of the '917 patent states that "the hard material being long wearing and virtually indestructible during normal use of the finger ring so that each facet retains its mirror finish." Thus, it appears that the claims in fact are describing the retention of the aesthetic properties of the ring. Accordingly, the Court will adopt West's proposed construction.

b. "During Normal Use"

West argues that its definition is supported by the specification. See '314 patent, col. 1, lns. 39-43; '972 patent, col.1 lns.39-43. Benchmark asserts that this term does not require construction because it has a common meaning. In view of the arguments and the specification, the Court will adopt West's proposed construction.

6. "Without Variations In Its Width"

The phrase "without variations in its width" is used in the asserted claims of the '972 patent. Independent claim 1 is representative with the highlighted term in bold.

> 1. A finger ring comprising : an annular body made of a sintered hard material comprising a predominately tungsten carbide material, wherein the annular body has at least two external surfaces that are continuous and of a width sufficient to provide each external surface with a facet . . . wherein each facet extends concentrically and continuously around the circumference of the ring **without variations in its width** . . .

The parties propose the following construction:

| Term | West's proposed construction | Benchmark's proposed construction |
|---|---|---|
| "without variations in its width" | with no appreciable variations in its distance from side to side when viewed with the naked eye of an ordinary ring wearer | no measurable variation in width |

The dispute between the parties involves not so much the meaning of the phrase as the meaning by which any variation, or lack of it, is to be determined. West's proposed definition states that such variation should be determined visually by the naked eye of the ring wearer. Benchmark asserts that any variation should be measured more precisely.

11

1    West identifies language in the specification that it claims supports its argument that the
2 variation does not need to be laser like precision. *See* '972 patent, col. 7 lns. 56-59; col.8 lns 61-
3 64. For example, West points to one passage describing facets that states that the "highly
4 polished facets 121 on the outer surface of the ring create a unique design and visual impression
5 heretofore not possible using prior art ring making techniques." '972 patent, col.7 lns.56-59.

6    Benchmark argues that during prosecution of the '972 patent, the examiner cited to a
7 piece of prior art, U.S. Patent No. 2,050,253 ("Bager"), which taught a ring with a cavity or
8 groove set to receive an ornamental strip. According to Benchmark, the illustrations in Bager
9 show a uniform cavity with no variation in width to the naked eye. However, in the remarks,
10 West asserted that while the illustrations appear to show a uniform-width ring, "it is clear that the
11 pressing and contracting would necessarily result in modification of the width to introduce
12 variations therein . . ." According to Benchmark, this means that the variation must be measured
13 by a means more precise than that taught in Bager. Benchmark also argues that jewelry industry
14 is by nature based on precise measurements and thus the width of the ring must be subject to
15 more precise measurement. However, Benchmark provides no evidence to support this assertion.

16    West responds to the argument of prosecution history estoppel based on Bager by noting
17 that the amendment "refers to a patent that discusses "chasing" of an ornamental strip, meaning
18 the ornamental strip is mechanically altered to introduce variations in its width." Plaintiff's
19 Reply at 10: 2-4. There appears to be no clear disavowal of scope. Rather, the specification
20 supports West's construction. Accordingly, the Court adopts the construction of this term
21 proposed by West.

23 IT IS SO ORDERED.

26 DATED: April 10, 2008

JEREMY FOGEL
United States District Judge

Case No. C-07-1812 JF (HRL)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENTS
(JFLC3)

1  This Order has been served on the following persons:

2  ──────

3  evking@kingandkelleher.com

4  bekins@joneswaldo.com

5

6  trojan@trojanlawoffices.com

7  evking@kingandkelleher.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C-07-1812 JF (HRL)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENTS
(JFLC3)